In the Matter of the Guardianship of ALICE HANNAH NEWMAN, an Infant.

Surrogate's Court, Chenango County, February —, 1932.

*Julien Scott,* for the petitioner, Mabel B. Hibbard.

*Edward H. O'Connor* [*Hubert C. Stratton* of counsel], for Mary Newman Moran and others.

BROWN, S. This proceeding is brought by Mrs. Mabel B. Hibbard for revocation of letters of guardianship of the person of Alice Hannah Newman, an infant, issued to Charles B. Newman.

Letters of guardianship were issued July 20, 1931, on the petition of Charles B. Newman, of Sherburne, and Frank O. Merrill, of Sidney, the former a paternal and the latter a maternal uncle of said infant. None of the relatives of said infant residing in Chenango county were cited on the application for the appointment. On September 8, 1931, the petitioner, Mabel B. Hibbard, filed a petition asking for the revocation of letters of guardianship issued to Charles B. Newman as to the person of said infant, and asking that letters of guardianship of the person of said infant be issued to the petitioner.

Andrew Newman, the father of the infant, died June 12, 1931, leaving a widow, Lulu M. Newman, a son, Robert Newman, about eighteen years of age, and two brothers and four sisters. One of the brothers, the person appointed as guardian, and two of the sisters reside in Chenango county. At the time of his death, Mr. Newman, with his wife and son Robert, lived in the village of Sherburne, Chenango county.

Lulu Newman died at the Chenango Memorial Hospital in Oneida July 15, 1931, leaving the son Robert and the infant Alice Hannah Newman, who was born at the hospital on July 1, 1931.

She also left a brother, Frank Merrill, and the petitioner, Mrs. Hibbard, a niece, the latter residing in Chenango county and the former in the county of Delaware.

On the 11th day of August, 1931, sitting as a judge of the Children's Court, and on the petition of Mrs. Hibbard, I directed that she take the infant into her custody, to be cared for until the further order of the court. This direction was made after ascertaining that the physician in charge of the infant at the hospital announced it was suitable and proper that the child be removed from the care at that institution. At the time of placing the custody of the child with Mrs. Hibbard the fact that letters of guardianship had previously been granted was entirely overlooked.

At the time of the application for letters of guardianship of Robert Newman and of the infant, Alice Hannah Newman, no emphasis was placed upon the guardianship of the person of said infant. The chief purpose of the application at that time, as suggested, was to enable a guardian to apply for letters of administration on the estate of Lulu M. Newman. The application for letters of guardianship was made *ex parte*, no notice having been given to any of the relatives of the infant residing in Chenango county, although waivers of the service of a citation in the matter of the guardianship, executed by relatives on the father's side, were filed in this court September 17, 1931, several weeks after the granting of letters. Later, being satisfied that the order giving the custody of the infant to Mrs. Hibbard was made without jurisdiction in the premises, I made an order in the Children's Court proceedings revoking such former order.

While the petition for letters of guardianship was joined in by Frank O. Merrill, a brother of the mother of the infant, it appears from his evidence in this proceeding that at the time he was requested to execute the papers which were signed, following the placing the body of his sister in the grave, he understood that the papers signed by him related to the guardianship of Robert and not the infant, Alice Hannah Newman, and understood that the custody of the infant would later be determined by the court. As the uncle of the child, he prefers that the petitioner in this proceeding should have its custody.

Authority for the application for revocation of letters is found in section 99 of the Surrogate's Court Act, and this application is based upon the ground that the interest of the infant will be promoted by the appointment of the petitioner.

That the guardian and his sisters, who are seeking to have the guardianship remain in Charles B. Newman, are highly respectable people is not questioned. The same suggestion applies with equal

force to Mrs. Hibbard, the petitioner in this proceeding. There is no question of moral fitness raised by either side. The predominating question is the welfare of this child. (*People ex rel. Pruyne* v. *Walts,* 122 N. Y. 238; *Matter of Lee,* 220 id. 532; *People ex rel. Jones* v. *Johnson,* 205 App. Div. 193; *Ullman* v. *Ullman,* 151 id. 419; *People ex rel. Elder* v. *Elder,* 98 id. 244; *Matter of Meyer,* 156 id. 174; *Matter of Cross,* 92 Misc. 89; *Matter of Gustow,* 220 N. Y. 373.) We are concerned solely with such a disposition of the case as will result in the well being of the infant, and will assure to her that tender care and nursing during the early part of her life, as well as such a tender affection and sympathetic understanding during her childhood, as will nearest approach a mother's love and anxiety, having in mind, of course, the ability of the guardian to furnish a suitable home.

Charles B. Newman, to whom letters were issued, is a bachelor, fifty-one years of age. During part of the time he has employment in driving a truck, and in the winter time does not engage in work. He maintains no home of his own, but boards with his sister, Mrs. Moran. Obviously he is inexperienced in the rearing and care of children, and if the custody of the child remains with him, he will have to confide the care and nursing of the infant to others. It would appear from the evidence of Mrs. Griffin, his sister, that there had been some discussion among the sisters and himself, or at least between him and Mrs. Griffin, that his sisters would assist in caring for the child, and it was contemplated that the infant might be sent to a hospital at Troy, N. Y., for a time, where one of the sisters is employed, but for how long does not appear. How the care of the child might be divided as to time between the other sisters, whenever she might be returned from Troy, is not disclosed. They come forward in this proceeding and offer to take over the care of the infant, provided the guardianship remains with the brother.

In what way will the welfare of the infant be promoted if taken into the homes of the guardian's sisters? Mrs. Moran, one of the sisters, is a woman forty-nine years of age, past middle life. She has three children of her own, who will be beyond the ages to be companions or playmates of the infant when she shall have arrived at the age to enjoy such companionship. It is not reasonable to expect that a woman of her age, with the responsibilities of a family of three children ranging in age from eleven to thirteen, would have that patience and solicitude demanded in the care and attention required in the bringing up of this baby, now a few months old. Mrs. Geisenhoff, another sister of the guardian, asserted she would be willing to support the baby in her family, but stated her husband

had obligations resting on him in connection with the support of dependent relatives. Mrs. Geisenhoff was married in 1920, and is past middle life, being fifty-four years of age, and so far as the evidence disclosed has had no experience in bringing up children, and I fail to find any proof indicating that the happiness and well being of this child would be better served if in the care of Mrs. Geisenhoff instead of Mrs. Hibbard. Mrs. Griffin, another sister, is sixty-one years of age, one of her five children, an unmarried son thirty years of age, living at home. It is most commendable in Mrs. Griffin, the eldest of Andrew Newman's sisters, to make this offer, even though she may realize she has passed the time in life when she should be burdened with the cares and trials incident to the rearing of an infant. Each of the sisters of the guardian who have offered to take this child will have reached advanced years in life before this infant has passed through the period of adolescence. If letters of guardianship remain with Charles B. Newman, and he has this child cared for in the homes of the three sisters, she will have no fixed or permanent place of abode, but be subject to change from one family to the other, and will lose the benefits of the permanency of home life. A permanent and fixed home is essential to the welfare of any child.

The petitioner in this proceeding offers to take this child into her home, care for and rear her, without expense to the infant's estate. She does not ask or expect any compensation or any financial aid in the care and support of the child. Mrs. Hibbard and her husband conduct a hotel in the village of Bainbridge, N. Y., and apparently have a profitable business. She is only thirty-three years of age. The family have separate living apartments in the hotel. She has a woman cook, a chambermaid, kitchen girl, dining room help, and a maid for the two children whom she has heretofore adopted. One of the children, a little girl, adopted in May, 1927, is four years of age. The other, a boy, adopted in July, 1929, is three years of age. Since Mrs. Hibbard has had the custody and care of the infant, the subject of this controversy, she has given her personal attention and care to the child, and the evidence shows it has thrived, and although a prematurely-born child, is healthy and has steadily gained in weight under her attention. Her fondness for children is evidenced by the taking into her home of the little boy and girl adopted, and her willingness and desire to be a mother to the little one now in her care.

Evidence was given to show the financial ability of Mr. Newman and his sisters. It may be that they are possessed of more wordly goods than Mrs. Hibbard. This element does not necessarily govern

the question in determining what may eventually be for the best welfare of the child. Other considerations are entitled to equal, if not greater, weight. A motherly interest and tender and considerate affection and sympathetic companionship during the years of early childhood and girlhood are factors of prime importance in determining what will best promote the interest and welfare of this infant. I am impressed with the belief that Mrs. Hibbard has an unselfish and real affection for the child, perhaps in part springing from her early affection for Mrs. Newman, the infant's mother, who was only a few years the senior of Mrs. Hibbard, and in part because of her maternal affection for children.

The appearance of Mrs. Hibbard on the witness stand, her method and manner of giving evidence, and her frankness and gentleness indicate refinement and character. That she has become strongly attached to the infant is plainly evident. The latter fact, however, cannot be considered in arriving at a decision here, except as it may bear upon the future welfare of the child. To my mind it is prophetic that the affection and devotion this woman is prepared to give, whether it springs from a mother's instinct or her former associations with and affection for the mother of this child in earlier years, will be of immeasurable benefit to this motherless child in the years ahead.

Mrs. Hibbard does not seek the guardianship of the property of the infant. The estate will be permitted to grow and increase until this child shall have reached her majority. I am not unmindful of the fact that the sisters of Mr. Newman stated they would be willing to take the child into their homes and care for her, but the evidence of Mr. Newman, the guardian, on this point is quite significant. In answer to the question by the court, " Q. You would expect to use the infant's own funds as far as they would go? " he testified, " If necessary. It wouldn't be very long anyway until Robert comes of age, and at that time I think probably Robert would be ready to assume charge of her." And in answer to the further question, " But if I understand you correctly, you would expect to use the infant's own funds until they were exhausted in the care of the infant, and would expect by the time they were exhausted Robert would be old enough to support her? " he testified, " Yes." From this evidence it is apparent that it is the intention of Mr. Newman to use the funds belonging to the infant for her care and support, and this, notwithstanding any conversations he may have had with his sisters in connection with their taking the infant into their homes. I gather from the evidence the impression that it is the thought of Mr. Newman that the estate of the infant

would be sufficient to last until Robert arrived at the age of twenty-one years.

It appears that at the time of the preparation of the papers for guardianship, or previous thereto, there had been some suggestion or mention made that Robert assume the guardianship of his infant sister on his arriving at twenty-one years of age. There is no proof that Mr. Newman has ever expressed a willingness to relinquish the guardianship of Alice Hannah Newman, and how guardianship was to be conferred on Robert, without such relinquishment on the part of Mr. Newman, or what they had in their minds at the time does not appear. Whether the suggestion of Robert becoming guardian of the infant upon his arriving at twenty-one years of age had anything to do with his giving consent to the appointment of Mr. Charles Newman is a question unanswered. However, I think no one will seriously argue that this young man, on reaching twenty-one years of age, will be a person qualified for the important and responsible duties of a guardian of an infant child, even though that child be his sister. Certainly any court would have hesitancy in granting letters of guardianship of an infant child, or of any child subject to the protection of the court, to a young man twenty-one years of age, inexperienced in business or the responsibilities of life.

The responsibilities placed upon the guardian of any child are of no small concern. The full force of this is probably more fully realized by parents than those who do not stand in such a position. Not the slightest suggestion is intended here that the intentions of Mr. Charles B. Newman are not of the best, but it will take more than good intentions to serve the best interest and promote the welfare of this child, now but a few months old. There is a hint in the record that Mr. Newman does not fully realize the responsibilities that rest upon him as a guardian of the person of this infant. Robert Newman, over whose person he was acting as guardian following the death of the mother, was at an age when guidance and supervision would be of vital importance, and yet we find that a short time after the death of his mother, Robert, instead of living with either of the aunts, was looking after his own wants and staying at the home of some boy friend a part of the time. A part of the time he was visiting friends and relatives. Except for the kindness and consideration of the father of Mrs. Hibbard, he would have been obliged to hitchhike from Bainbridge to Nicholson, Pa., where he desired to visit a friend with whom he had become acquainted in church work. We find him there without sufficient funds to return to Sherburne, although it must have been known to the guardian when Robert left Sherburne that he did not have the funds with which to make the trip and return. This may

have been but thoughtlessness and carelessness on the part of the guardian and a failure to fully realize the exacting responsibilities of guardianship.

During the hearings emphasis was attempted to be placed on the closer relationship of the guardian and his sisters than that of Mrs. Hibbard to the child. Relationship, or nearness thereof, to the ward is not a controlling factor in the selection of guardians. (*Matter of Vandewater*, 115 N. Y. 669; *Matter of Cross*, 92 Misc. 89.)

A further question of more than minor importance is present in this application. A question made important by reason of the command of the statute of this State and the decisions of our courts. It relates to the religious faith in which this child is to be brought up. Subdivision 3 of section 302 of the State Charities Law (as added by Laws of 1930, chap. 590) is as follows: " In appointing guardians of children, and in granting orders of adoption of children, the court shall, when practicable, appoint as such guardians, and give custody through adoption, only to a person or persons of the same religious faith as that of the child." The rights of parents to dictate the religious faith in which their children should be brought up has long been recognized by the courts. In former times the wishes of the father in this respect were considered as controlling, but such rule has been changed, and the rules of the common law in this respect no longer prevail. The mother is a joint guardian with her husband. Her rights and duties in this respect are equal. (Dom. Rel. Law, § 81, as amd. by Laws of 1925, chap. 67; *Ousterhoudt* v. *Ousterhoudt*, 168 N. Y. 358; *People ex rel. DeLaney* v. *Mt. St. Joseph's Academy*, 198 App. Div. 75; *Matter of Kellogg*, 187 N. Y. 355; *People ex rel. Woolston* v. *Woolston*, 135 Misc. 320.)

Charles B. Newman, the guardian, and his sisters are of the Catholic faith. The petitioner, Mrs. Hibbard, is of the Protestant faith and a member of the Presbyterian church in Bainbridge, N. Y. Andrew Newman, the father of Alice Hannah Newman, was brought up in the Catholic faith. Lulu Newman, the mother of the infant, was of the Protestant faith and a member of the Methodist Episcopal church, and had been since a young woman. The father and mother of this child were married by a clergyman of the Methodist Episcopal church, and so far as the record shows, Andrew Newman, the father, was not an attendant or communicant of the Catholic church after such marriage. His funeral services were conducted by the pastor of the Methodist Episcopal church in Sherburne. He was buried in a non-Catholic cemetery. That the love of Andrew Newman for his wife was stronger than his religious convictions is unmistakably clear. Obviously, the home

life of Andrew Newman and his wife was unmarred by petty strife or disagreements, and we are told by Mrs. Moran that there was no friction between them concerning religious beliefs, and that the relations between Andrew Newman and his wife and the former's brothers and sisters were cordial. I infer that Mr. and Mrs. Newman were devoted to each other, and the high terms in which Mrs. Newman has been spoken of leads me to the belief that she would not have wished or contenanced the funeral services to have been conducted by the pastor of the Methodist Episcopal church unless she knew, or at least felt satisfied, that such course would have been approved by Andrew Newman. We have no way of knowing whether the subject had ever been discussed between them or not. The only inference justified by the evidence is that at the time of the death and burial of Andrew Newman he was not a member in good standing of the Catholic church. Mrs. Moran, the sister, was given an opportunity to disclose whether or not he was in good standing in the Catholic church at the time of his death. She evaded a direct answer.

The son, Robert, had been baptized in the Methodist Episcopal church, and had been a member of that church for some time, identified with one of the young peoples' societies of the church, and acted as usher. Shortly before the death of Mrs. Newman she gave her consent for the enrollment of Alice Hannah Newman, the infant, in the cradle roll of the Methodist Episcopal church, thereby expressing a desire that the infant should be brought up in the faith of the church of which she was a member and communicant, and which she attended as frequently as her health would permit. The baptism of Robert in the Methodist Episcopal church, his attendance there regularly, and his membership in one of the church organizations for young people must have met with the entire approval of his father in his lifetime, for there is no indication whatever that he ever raised any objection, or even made any criticism, concerning the same. The mother of the infant survived the father. There is no proof before this court that the father, had he been the survivor, and knowing the wishes of the mother, would have brought this child up in the Catholic faith. The whole history of the life of this man and woman would indicate he would have deferred to what would have been the wishes of the mother. There is no doubt whatever that it was the wish of Mrs. Newman that the child should be reared in the Protestant faith. All had been done that could be done, before the death of Mrs. Newman, to bring this child within the teachings and faith of the Methodist church. She had been enrolled as a member

of the cradle roll. So that the religious faith of this child was the same as that of the mother.

Robert Newman, the brother of this child, following the death of his mother, had repeatedly expressed the wish and desire that Mrs. Hibbard should have the care and custody of the little sister. This is shown by the evidence of disinterested witnesses. When confronted with the previous statements made by him in reference to this subject he showed lamentable lapses of memory, for which no good explanation was given, but was unwilling to deny that he had made the statements. Although the evidence shows that while his mother was living he had planned to attend a school in Trenton, N. J., we now find him in a Catholic school, but there is nothing to indicate that he is not still of the same religious faith of his mother and in which he has lived from boyhood.

The petitioner, Mrs. Hibbard, has promised, in case letters of guardianship are issued to her, to see that this child is brought up in the Methodist Episcopal church, the church of her mother's affiliation, and the church in which she is enrolled. There has been no promise and no suggestion, on the part of Charles B. Newman, the guardian, that he would be willing that this child should be brought up in the religious faith of the mother.

I deem the religious faith of the mother the faith of this infant child, for the purposes of guardianship, under the statute.

I cannot escape the conviction that it would be the earnest desire of Lulu Newman, were it possible for that desire to be expressed any more emphatically than it was during her lifetime, that this child should be brought up in the faith of the Methodist Episcopal church. I am also satisfied that if that was the wish of the mother it would have been the request of a husband who was devoted to the wife, and whose wishes in her lifetime as to the religious faith of the offspring were not only respected, but made his wishes.

I am satisfied that the welfare of the infant will be promoted if given into the custody of Mrs. Hibbard.

The letters of guardianship of the person of Alice Hannah Newman issued to Charles B. Newman may be revoked, and letters of guardianship of the person of Alice Hannah Newman issued to Mabel B. Hibbard, and decree in accordance with this decision may be entered.